**SHEEHAN & ASSOCIATES, P.C.**
Spencer Sheehan
505 Northern Blvd., Suite 311
Great Neck, NY 11021
Telephone: (516) 303-0552
Facsimile: (516) 234-7800
*spencer@spencersheehan.com*

*-and-*

**REESE LLP**
Michael R. Reese
100 West 93rd Street, 16th Floor
New York, NY 10025
Telephone: (212) 643-0500
Facsimile: (212) 253-4272
*mreese@reesellp.com*

*-and-*

**JAMES CHUNG, ESQ.**
*jchung_77@msn.com*

United States District Court
Southern District of New York                                   7:19-cv-11521

| | |
|---|---|
| Max Brizer, individually and on behalf of all others similarly situated,<br><br>         Plaintiff,<br><br>    - against -<br><br>Zillow, Inc.,<br><br>         Defendant | <br><br><br><br><br><br>Class Action Complaint |

Plaintiff by attorneys alleges upon information and belief, except for allegations pertaining to plaintiff, which are based on personal knowledge:

1. Zillow, Inc. ("defendant") operates the nation's dominant home buying platform at Zillow.com, which purports to make the process of buying and selling a home less complex and lower priced.

1

2. In today's economy, large swaths of commercial and social activity are dominated by "winner-take-all" online platforms in specific sectors.

3. Whether it is Google for search, Amazon for commerce, Facebook for social networking, Yelp for reviews, Uber for on-demand transportation or Zillow for home buying, "users often look to platforms to serve as filters" for the torrent of information the internet makes available.[1]

4. However, buying a home is several orders of magnitude more significant than spending $2.99 on toothpaste that arrives within two days or using an "app" to arrange a ride to the airport.

5. Buying a house or apartment is the most expensive purchase most Americans will ever make and is often their main retirement asset.

6. Approximately 80% of prospective homebuyers use defendant's website in beginning their home search.

7. This usage gives defendant's platform "the power to tilt the real-world playing field in favor of its own favored counterparties" – "Premier Agents" – who, unbeknownst to users, pay monthly fees to be associated with properties they have no connection to.[2]

8. Defendant relies on Premier Agents to collect revenue and is incentivized to re-direct inquires made to listing agents and skew its design and interface cues to benefit Premier Agents.

9. These tactics enable defendant to deliver on the 15-20 leads it promises Premier Agents each month so that they continue paying, and defendant's stock price keeps rising.

10. Defendant's practices are unfair and deceptive towards traditional real estate brokers and listing agents and cause consumer confusion, economic harm and deception.

---

[1] John M. Newman, "Complex Antitrust Harm in Platform Markets," CPI Antitrust Chronicle, May 2017 at p.6.
[2] *Id*.

11. Prospective homebuyers are stymied in attempting to contact a property's listing agents, who are sought out for their connection to the property and their local knowledge.

12. It is the analog equivalent to buying a billboard to advertise another real estate broker's listing but with the contact information of defendant's preferred "counterparties" – Premier Agents.

13. Consider that when a prospective homebuyer searches the internet for available houses in an area, the first few search engine results will include listings on defendant's website.

14. On a desktop computer, clicking through to a property listing presents the user with a prominent, bright blue bar stating "Contact Agent."

15. After clicking, the user is prompted to provide their name, phone number and email, alongside a "listing agent" and three "premier agents."

16. Before clicking "send," the user can, but is not required to, select a circular radio button next to one of the agents.

17. On a mobile device, where most consumers interact with defendant's website, the misdirection is greater.

18. Upon arriving at a webpage for a property, a user is presented with prominent calls to action – "Call Agent" and "Message Agent."

19. When they press "Call Agent," the number automatically pulled up is that of a "Premier Agent."[3]

---

[3] The full numbers along with images and names of the agents has been blacked out for privacy purposes.

| Search Results Landing Page | "Message Agent" Display |
|---|---|
|  |  |

20. That the above number in the left image beginning with "718" corresponds to one of the Premier Agents on the listing is evident from the right image, where pressing "Call" next to "Listing Agent" brings up a number beginning with "917."

21. The "718" number matches one of the numbers for a Premier Agent in the right image.

22. Moreover, when a prospective homebuyer lands on the page for a property, it requires several scrolls to even identify the listing agent among the multiple premier agents.

23. According to reports, even when a user selects the radio corresponding to a listing

4

agent (desktop and mobile), their information is (1) actually transmitted to defendant's employees who screen them over the phone, by text message and/or email, prior to connecting them with a Premier Agent and (2) in many instances, not even sent to the listing agent but to defendant's preferred Premier Agents.

24.     When a user fills out their information, but does not select an agent and presses or clicks "Send," this submission also goes to defendant's employees who re-direct them to the Premier Agents.

25.     This is contrary to expected behavior where a selection is not specifically made, which would presumably transmit the submission to all the agents listed next to a property.

26.     Where a listing agent has not signed up to be a Premier Agent, the profile image next to their name is often blank, empty and gray, making it unlikely a prospective homebuyer will contact them as opposed to the Premier Agents.

27.     The overall result of defendant's web design is that after the prospective homebuyer is screened by defendant's employees, they will be contacted by Premier Agents.

28.     Defendant's practices make it improbable for a prospective homebuyer to successfully contact the listing agent instead of the Premier Agents.

29.     However, the Premier Agents are unable to provide the information requested because they have no connection to the property being advertised, other than having paid defendant to be presented prominently next it.

30.     This "bait and switch" tactic draws the prospective buyer in with a property they desire only to show them a completely different property they had no desire to see.

31.     Premier Agents steer the prospective homebuyers to properties that are better financial arrangements for them as opposed to the homebuyers, and attempt to induce, and induce

them into signing Buyer's Agent Agreements or duel agency agreement to egregiously maximize their commission.

32. In a standard home purchase/sale, the buyer and seller are represented by individual real estate agents who equally split a commission, i.e., 6%.

33. However, a dual agency transaction with the agent "representing" the buyer and seller lets an agent keep the entire commission.

34. This opportunity to engage in "dual agency" is one of the main selling points to Premier Agents, as studies have shown that such agents have more, and a higher percent of, dual agency transactions compared to non-Premier agents.

35. From the first time a prospective homebuyer engages with defendant's site, neither the Premier Agents nor defendant explain to prospective homebuyers that Premier Agents are representing interests adverse to them.

36. In such circumstances, it is not possible to obtain meaningful consent.

37. Consumer groups and government agencies have cautioned prospective homebuyers from being enticed into dual agency transactions.

38. Though dual agency is permitted in all states, it requires disclosures to prevent the agent from taking unfair advantage of the public's lack of knowledge, market customers, experience and awareness of available contractual options.

39. To prevent practices such as those described here, an advertisement of a real estate broker on a property where they are not the listing agent is required to conspicuously disclose the listing agents to prospective buyers.

40. The purpose of this is to prevent prospective buyers from falling into the clutches of real estate agents who (1) have no interest in showing or selling the property they viewed, (2) no

relation to or knowledge about the listing for which they submitted the initial inquiry, (3) are dishonest and may perpetrate or aid in the perpetration of frauds in the brokerage and sale of real estate and (4) are inexperienced and inept.

41. Defendant's actions in Pennsylvania are contrary to law in that jurisdiction by promoting its paying agents on listings of properties that are "For Sale By Owner," causing prospective buyers to expect the brokers are affiliated with the sellers.

## Jurisdiction and Venue

42. Jurisdiction is proper pursuant to 28 U.S.C. § 1332(d)(2) (Class Action Fairness Act of 2005 or "CAFA").

43. Under CAFA, district courts have "original federal jurisdiction over class actions involving (1) an aggregate amount in controversy of at least $5,000,000; and (2) minimal diversity[.]" *Gold v. New York Life Ins. Co.*, 730 F.3d 137, 141 (2d Cir. 2013).

44. Upon information and belief, the aggregate amount in controversy is more than $5,000,000.00, exclusive of interests and costs.

45. Plaintiff Max Brizer is a citizen of New York.

46. Defendant Zillow, Inc. is a Washington corporation with a principal place of business in Seattle, King County, Washington and is a citizen of Washington.

47. This court has personal jurisdiction over defendant because it conducts and transacts business, contracts to provide and/or supply and provides and/or supplies services and/or goods within New York.

48. Venue is proper because plaintiff and many class members reside in this District and defendant does business in this District and State.

49. A substantial part of events and omissions giving rise to the claims occurred in this

District.

## Parties

50. Plaintiff Max Brizer is a citizen of Westchester County, New York and is a New York licensed real estate salesperson and/or real estate broker.

51. Plaintiff Brizer has been a listing agent for various properties on defendant's website and lost money due to Premier Agents who paid defendant to be on his listings.

52. Defendant is a Washington corporation with a principal place of business in Seattle, Washington, King County and is a citizen of Washington.

## Class Allegations

53. The class will consist of all real estate brokers and real estate sales agents in New York, Pennsylvania and States where defendant conducts business..

54. Common questions of law or fact predominate and include whether defendant's representations and practices were likely to harm plaintiff, the general public and if plaintiffs and class members are entitled to damages.

55. Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair and deceptive actions.

56. Plaintiff is an adequate representative because his or her interests do not conflict with other members.

57. No individual inquiry is necessary since the focus is only on defendant's practices and the class is definable and ascertainable.

58. Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

59. Plaintiff's counsel is competent and experienced in complex class action litigation

and intends to adequately and fairly protect class members' interests.

60. Plaintiff seek class-wide injunctive relief because the practices continue.

New York GBL § 340
("Donnelly Act")

61. Plaintiffs incorporate by reference all preceding paragraphs.

62. The relevant market for real estate broker services is the state of New York.

63. Defendant enables and promotes the Premier Agents to do indirectly what it cannot do directly – advertise to and solicit prospective homebuyers based on the listings supplied by other real estate brokers, without permission.

64. When a prospective homebuyer clicks on a webpage connected with a property listing and supplies their contact information, this information is directed to defendant's employees, who screen them prior to being forwarded to Premier Agents.

65. This is contrary to standard advertising practices purchasers who have an arms-length relationship with the platform where they buy advertising.

66. Defendant fails to conspicuously disclose these facts to prospective purchasers to benefit the Premier Agents.

67. Though the Premier Agents have a cloak of independence from defendant, this is belied by their relationship.

68. Defendant selects Premier Agents from real estate brokers based on factors such as the number of homes sold within the previous year.

69. Defendant maintains the unilateral right to terminate Premier Agents and otherwise control or direct their conduct through tacit or other means.

70. These factors are the hallmarks of an employer-employee relationship with the Premier Agents acting as real estate brokers or agents under defendant.

71. The effects of defendant's concerted efforts with Premier Agents is to prevent and/or hinder prospective buyers from having access to the listing agents.

72. This causes consumer confusion and frustration, and immediately harms the listing agents who are not adequately disclosed in connection with the potential sale of a property.

73. Prospective homebuyers are induced by defendant's employees to enter into Buyer's Agent agreements or dual agency transactions which typically include higher fees for the agent, compromised representation for the prospective buyer and result in less money spent on purchasing a home.

74. Prospective homebuyers are hindered from viewing the properties they initially intended to, due to the skewed incentives of the relationship between defendant and Premier Agents.

75. The Premier Agents, in turn, supply defendant with the monthly advertising revenues needed to consolidate control in the real estate industry, to the detriment of licensed real estate brokers, agents and those operating for them.

<u>New York GBL §§ 349 & 350</u>
<u>(Consumer Protection from Deceptive Acts)</u>

76. Plaintiffs incorporate by reference all preceding paragraphs.

77. Defendant's acts and omissions are not unique to the parties and have a broader impact on the public.

78. Defendant's actions are harmful to prospective homebuyers by referring them to agents whose only connection to a desired property is that they paid the most money in a particular geographic area to defendant and lack knowledge of the listing and surrounding area.

79. Defendant's actions cause consumer confusion and financial harm, by inducing or attempting to induce them to sign Buyer's Agent Agreements or Duel Agency Agreements.

80. Defendant's actions have a detrimental effect on licensed real estate brokers and those working for them since defendant's business model is based on Premier Agents paying to be listed on properties which they are not the listing agents and obscuring the identities and contact information for the listing agents.

## Unfair Competition

81. Plaintiffs incorporate by reference all preceding paragraphs.

82. Defendant misappropriated the labors and expenditures of plaintiffs by failing to adequately disclose they were the listing agents.

83. This caused harm to the listing agents by diverting leads and lost sales.

84. Defendant's bad faith is evident by its efforts at promoting the "Premier Agent" program at the expense of listing agents and to the detriment of prospective homebuyers, in knowing violation of law and in opposition to the interest of prospective homebuyers.

## Unjust Enrichment

85. Plaintiff incorporates by reference all preceding paragraphs.

86. Defendant obtained benefits and monies because they profited off the labor and expenses of listing agents, who seek restitution and disgorgement of inequitably obtained profits.

## Jury Demand and Prayer for Relief

Plaintiff demands a jury trial on all issues.

**WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying Plaintiff as representative and undersigned as counsel for the class;

2. Entering preliminary and permanent injunctive relief by directing defendant to correct the challenged practices to comply with the law;

3. Injunctive relief to remove, correct and/or refrain from the challenged practices and

representations, restitution and disgorgement for members of the State Subclasses pursuant to the applicable laws of their States;

4. Awarding monetary damages and interest, including treble and punitive damages, pursuant to the common law and other statutory claims;

5. Awarding costs and expenses, including reasonable fees for plaintiff's attorneys and experts; and

6. Other and further relief as the Court deems just and proper.

Dated:   December 17, 2019

                                               Respectfully submitted,

Sheehan & Associates, P.C.
/s/Spencer Sheehan
Spencer Sheehan
505 Northern Blvd., Suite 311
Great Neck, NY 11021
Telephone: (516) 303-0552
Facsimile: (516) 234-7800
*spencer@spencersheehan.com*
E.D.N.Y. # SS-8533
S.D.N.Y. # SS-2056

                 -and-

Reese LLP
Michael R. Reese
100 West 93rd Street, 16th Floor
New York, NY 10025
Telephone: (212) 643-0500
Facsimile: (212) 253-4272
*mreese@reesellp.com*

                 -and-

James Chung, Esq.
jchung_77@msn.com

7:19-cv-11521
United States District Court
Southern District of New York

---

Max Brizer, individually and on behalf of all others similarly situated,

                Plaintiff,

- against -

Zillow, Inc.,

                Defendant

---

## Class Action Complaint

---

```
Sheehan & Associates, P.C.
 505 Northern Blvd., #311
   Great Neck, NY 11021
   Tel: (516) 303-0552
   Fax: (516) 234-7800
```

---

Pursuant to 22 NYCRR 130-1.1, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information, and belief, formed after an inquiry reasonable under the circumstances, the contentions contained in the annexed documents are not frivolous.

Dated:  December 17, 2019

                                            /s/ Spencer Sheehan
                                               Spencer Sheehan